**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | |
|---|---|
| **JUANDRITTA NEAL,** } | |
| } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:   7:24-cv-01583-MHH** |
| } | |
| **FRANK J. BISIGNANO,** } | |
| **Commissioner of the Social Security** } | |
| **Administration,**[1] } | |
| } | |
| **Defendant.** } | |

**MEMORANDUM OPINION**

Juandritta Neal, who is proceeding *pro se*, has asked the Court to review a final adverse decision of the Social Security Commissioner. The Commissioner terminated Ms. Neal's claim for supplemental security income on behalf of her minor child, K.N., based on an Administrative Law Judge's finding that K.N.'s disability ended on February 14, 2023.[2] In her complaint, Ms. Neal asserts that the

---

[1] On May 7, 2025, Frank J. Bisignano became the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank J. Bisignano should be substituted as the defendant in this suit. *See* Fed. R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds officer, the "court may order substitution at any time. . . .").

[2] Where, as here, an ALJ denies benefits and the Appeals Counsel denies review, the ALJ's decision is the Commissioner's final decision for purposes of this Court's review. *See Samuels v.*

1

Commissioner did not review documents K.N.'s doctor submitted that detail new diagnoses and kidney problems. (Doc. 1, p. 5).[3]  Several months after filing her complaint, Ms. Neal submitted medical records dated July 10, 2024, December 23, 2024, April 22, 2025, and June 11, 2025.  (Doc. 9).  Because Ms. Neal is proceeding *pro se*, the Court construes her complaint liberally.  *See Curtis v. Comm'r of Soc. Sec.*, 856 Fed. Appx. 276, 276 (11th Cir. 2021) (applying the liberal construction rule to a *pro se* Social Security appeal).  For the reasons described below, the Court reverses the Commissioner's decision and remands this matter for further proceedings.

## ADMINISTRATIVE PROCEEDINGS

For a claimant under age 18 to qualify for supplemental security income benefits, she must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  In a

---

*Acting Comm'r of Soc. Sec.*, 959 F.3d 1042, 1045 (11th Cir. 2020) (internal quotation and citation omitted).

[3]  Ms. Neal did not have to file a brief in support of her challenge to the ALJ and Appeals Council's decisions.  The briefing notice in this matter states:  "Unless the plaintiff is proceeding without counsel, initial briefs will be required of all parties."  (Doc. 5, p. 1).  Because Ms. Neal did not file a brief, the Court relies on her complaint to understand her position in this appeal.

cessation of benefits case, the issue is whether substantial evidence demonstrates the claimant's impairments medically improved to the point that she no longer had marked and severe functional limitations. *See* 42 U.S.C. § 1382c(a)(4)(B); 20 C.F.R. § 416.994a. Although K.N. previously was found disabled, she was not entitled to a presumption of continuing disability. *See* 42 U.S.C. § 1382c(a)(4); 20 C.F.R. § 416.994a(a)(2).

The regulations define the statutory standard of "marked and severe functional limitations" as "a level of severity that meets, medically equals, or functionally equals the listings." 20 C.F.R. § 416.902(h); *see* 20 C.F.R. §§ 416.906, 416.924(a), 416.926a(a); *see also* 20 C.F.R. pt. 404, subpt. P, app. 1 (the Listing of Impairments). To determine if a severe impairment functionally equals a listing, the ALJ must assess the claimant's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)–(vi). An impairment "is of listing level severity if [the claimant has] 'marked' limitations in two of the domains . . . or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(d).

A child's impairment or combination of impairments constitutes a "marked" limitation when it interferes "seriously" with her ability to "independently initiate,

sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A child's impairment or combination of impairments constitutes an "extreme" limitation when it interferes "very seriously" with her ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). "[N]o single piece of information taken in isolation can establish whether [a claimant has] a 'marked' or 'extreme' limitation in a domain." 20 C.F.R. § 416.926a(e)(4).

The Commissioner has established a three-step medical improvement review process to determine whether a child no longer is disabled. *See* 20 C.F.R. § 416.994a(a)(1), (b); Social Security Ruling (SSR) 05-03p, 2005 WL 1041037 (Apr. 27, 2005). The Commissioner compares the claimant's current conditions and limitations with those identified in the most recent favorable medical decision finding that the claimant continued to be disabled, known as the "comparison point decision" or CPD. *See* 20 C.F.R. § 416.994a(c). In determining whether medical improvement has occurred since the CPD, the Commissioner must consider:

1) Whether there has been medical improvement in the individual's condition?

2) Whether the individual's impairment still meets or equals the severity of the listed impairment it met or equaled before?

3) Whether the individual currently disabled?

*See* 20 C.F.R. § 416.994a(b)(1)-(3).

4

In this matter, the ALJ determined that K.N.'s comparison point decision is dated November 24, 2020. (Doc. 4-3, p. 34). The ALJ found that K.N. experienced medical improvement as of February 14, 2023. (Doc. 4-3, pp. 34–35). The ALJ determined that K.N.'s CPD impairment, a speech and language disorder, no longer functionally equaled the Listing of Impairments. (Doc. 4-3, pp. 35–40). The ALJ determined that K.N. was suffering from a severe impairment of low average intellectual functioning. (Doc. 4-3, pp. 40–41). The ALJ also determined that K.N. was suffering from the non-severe impairments of below average receptive language skills and mild persistent asthma without complication. (Doc. 4-3, p. 40).

Based on a review of the evidence, the ALJ concluded that K.N.'s impairments, singly and in combination, did not meet or medically equal the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart A, Appendix 1. (Doc. 4-3, pp. 41–45). The ALJ found that K.N. had "less than marked" limitations in the domains of acquiring and using information and health and physical wellbeing and "no limitation" in the other four domains. (Doc. 4-3, pp. 43–45). Accordingly, the ALJ determined that K.N. was not disabled between February 14, 2023 and the date of his decision, May 31, 2024. (Doc. 4-3, p. 45).

**EVIDENCE IN THE ADMINISTRATIVE RECORD**

*2017 Disability Determination*

In 2017, when K.N. was 3 years old, an ALJ found that K.N. had the severe impairments of hearing loss, speech/language delay, adenoid hypertrophy, chronic otitis media, asthma, and broncho pulmonary dysplasia. (Doc. 4-4, p. 8).[4] Because her severe limitations caused K.N. to have marked limitations in her ability to acquire and use information and ability to interact and relate to others, the ALJ found that K.N. was disabled beginning April 25, 2014 and awarded her supplemental security income benefits. (Doc. 4-4, pp. 9–11).

---

[4] Adenoid hypertrophy occurs when the adenoid, a mass of lymphatic tissue located in the back of the nose and throat, becomes larger and obstructs the nasal pathways. JOHNS HOPKINS, Adenoid Hypertrophy Care, https://www.hopkinsmedicine.org/all-childrens-hospital/services/otolaryngology-cochlear-implant-program/conditions/adenoid-hypertrophy [https://perma.cc/F7HU-HNF4] (last visited Jan 16, 2026).

Otitis media is an infection in the middle ear. MAYO CLINIC, Ear Infection (Otitis Media) (June 6, 2023), https://my.clevelandclinic.org/health/diseases/8613-ear-infection-otitis-media [https://perma.cc/4MP9-EU7C].

"Bronchopulmonary dysplasia (BPD) is a form of chronic lung disease that affects newborns, most often those who are born prematurely." AM. LUNG ASS'N., *Bronchopulmonary Dysplasia*, https://www.lung.org/lung-health-diseases/lung-disease-lookup/bronchopulmonary-dysplasia/learn-about-bpd [https://perma.cc/KAC7-7BGX] (last visited Jan 16, 2026). "In BPD the lungs and the airways (bronchi) are damaged, causing tissue destruction (dysplasia) in the tiny air sacs of the lung (alveoli)." AM. LUNG ASS'N.

### *2020 Disability Determination*

In 2020, a continuing disability review found that K.N. had the severe impairment of speech and language impairment. and medical improvement had not occurred.  (Doc. 4-3, p. 5).

### *2023 Disability Determination*

On March 22, 2022, when K.N. was 7 years old, Ms. Neal requested a continuing disability review based on "emotional problems" and "learning problems."  (Doc. 4-4, p. 13).  After reviewing Ms. Neal's request and available evidence, the Commissioner found that K.N. no longer was disabled as of February 14, 2023 and issued a cessation of benefits notice.  (Doc. 4-4, p. 12).

### *Speech-Language Pathologist Evaluations*

On September 1, 2020, Speech Language Pathologist Monica Franklin at Franklin Vocals evaluated K.N.'s speech and language skills.  (Doc. 4-9, pp. 22–23).  Ms. Franklin described K.N.'s background as follows:

> [K.N.], a 6[]-year-old AA female was seen for speech and language assessment per DDS referral. She was accompanied by her mother, [Ms. Neal], who served as provider of supplemental information. Medical history was remarkable for premature delivery at 24-weeks with subsequent NICU placement for several weeks. History also included Asthma, sleep apnea, and Sickle Cell disease.  Developmental milestones were reportedly observed within typical time frames with the exception of independent toileting which was noted around 4.0 years.  After aging out of Early Intervention, [K.N.] received therapy services through the Head Start program. During the 2019-2020 school year[,] she attended Kindergarten at Reform Elementary School with Special Education services.  [K.N.] lives with her mother and two older

7

sisters.  Continued speech intervention has reportedly been scheduled for the upcoming school year.

(Doc. 4-9, p. 22).

Ms. Franklin determined that K.N. demonstrated appropriate social interaction and eye contact and had oral structure and function adequate for normal speech production.  (Doc. 4-9, p. 22).  Ms. Franklin reported that a Tuscaloosa County School System hearing screening indicated that K.N. had normal hearing in both ears.  (Doc. 4-9, p. 22).

To assess K.N.'s articulation skills, Ms. Franklin administered the Goldman-Fristoe Test of Articulation-3.  (Doc. 4-9, p. 41).[5]  K.N. scored 93 on the GFTA-3. Ms. Franklin explained that K.N.'s score results indicated that she had average articulation skills for her age.  (Doc. 4-9, p. 22).

To assess K.N.'s language skills, Ms. Franklin administered the Oral and Written Language Scales-II.  (Doc. 4-9, p. 22).[6]  K.N. scored a 72 in listening

---

[5] The GFTA-3 tests children's speech sound production in three sections: sounds-in-words, intelligibility, and stimulability.  PEARSON ASSESSMENTS, *Goldman-Fristoe Test of Articulation 3*, (last accessed Jan. 22, 2026) https://www.pearsonassessments.com/en-us/Store/Professional-Assessments/Developmental-Early-Childhood/Goldman-Fristoe-Test-of-Articulation-3/p/100001202?srsltid=AfmBOoqzQ-ZrycRn5VD-2INbUp-Z4uzzfvY8VZ5Wn7nViDqWc3w4ECM_ [https://perma.cc/KQ26-P3L9].

[6] The OWLS-II tests children's language comprehension and expression, including oral language, written language, receptive processing, expressive processing, and overall language processing skills.  PEARSON ASSESSMENTS, *Oral Written Language Scales Second Edition*, (last accessed Jan. 22, 2026) https://www.pearsonassessments.com/en-us/Store/Professional-Assessments/Speech-%26-Language/OWLS-II-Oral-and-Written-Language-Scales-%7C-Second-Edition/p/100000293?srsltid=AfmBOop2-MGatsOlt8SqrT1Ov7a5JCm8iq4g69E618GTYFdGqku2hRON [https://perma.cc/SPV5-P57F].

comprehension and 88 in oral expression. (Doc. 4-9, p. 22). K.N.'s OWLS-II composite score was 78. (Doc. 4-9, p. 22). Ms. Franklin explained that these scores corresponded to below average listening comprehension skills, average oral expression skills, and a below average composite score. (Doc. 4-9, p. 22). In addition to the OWLS results, Ms. Franklin reported that K.N.'s comments were appropriate to the topic and her mean length of utterances were appropriate for her age. (Doc. 4-9, p. 23).[7] Ms. Franklin reported that K.N. attended to and followed instructions for testing without difficulty. (Doc. 4-9, p. 23).

In the areas of fluency and voice, Ms. Franklin reported that K.N. did not have abnormal disfluencies and had normal pitch, volume, and resonance. (Doc. 4-9, p. 23).

Based on her evaluation, Ms. Franklin opined that K.N. had a "moderate overall language impairment" that "put her at risk both academically and socially." (Doc. 4-9, p. 23).

Ms. Franklin evaluated K.N.'s speech and language skills two years later on November 14, 2022. (Doc. 4-9, pp. 41–42). Ms. Franklin described K.N.'s background as follows:

---

[7] MLU stands for mean length of utterance. This benchmark measures "a child's progress in the attainment of adult language." Rice, et. al., *Mean Length of Utterance Levels in 6-month Intervals for Children 3-9 Years with and without Language Impairments*, PUBMED CENTRAL, NATIONAL INSTITUTE OF HEALTH, https://pmc.ncbi.nlm.nih.gov/articles/PMC2849178/ [https://perma.cc/9JH3-7CNH].

> [K.N.] an 8[]-year-old female was seen for speech and language assessment per DDS referral.  She was accompanied by her mother, [Ms. Neal], who served as provider of supplemental information. Medical history was remarkable for Asthma that has been managed with medication.   [K.N.] received speech-language intervention through the school system and was discharged from speech services after reaching her target goals.  She is currently in the third grade and receives support for reading and math.

(Doc. 4-9, p. 41).

Ms. Franklin determined that K.N. demonstrated appropriate social interaction and eye contact and had oral structure and function adequate for normal speech production.  (Doc. 4-9, p. 41).  Based on K.N.'s response to conversational speech and a caregiver's report, Ms. Franklin determined that K.N's hearing was "adequate."  (Doc. 4-9, p. 41).

When Ms. Franklin administered the Goldman-Fristoe Test of Articulation-3, K.N. exhibited one sound error–substituting /f/ for /th/ in the final position–but "given cues/modeling" correctly pronounced the sound through the phrase level. (Doc. 4-9, p. 41).  Based on K.N.'s GFTA-3 results, Ms. Franklin opined that K.N.'s articulation was within normal parameters for her age.  (Doc. 4-9, p. 41).  Ms. Franklin reported that K.N.'s intelligibility for all listeners was 90% or greater for single words, phrases, and sentences.  (Doc. 4-9, p. 41).[8]

---

[8] Intelligibility refers to the extent to which a listener can understand a child's speech.  *See* Hustard, et al., *Development of Speech Intelligibility Between 30 and 47 Months in Typically Developing Children: A Cross-Sectional Study of Growth*, PUBMED CENTRAL, NATIONAL INSTITUTE OF HEALTH (May 27, 2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7839034/ [https://perma.cc/D7Z3-SWN5].

When Ms. Franklin administered the OWLS-2, K.N. had a standard score of 83 for listening comprehension and 87 for oral expression. (Doc. 4-9, p. 41). K.N.'s standard composite score was 83. (Doc. 4-9, p. 41). Ms. Franklin explained that these scores corresponded to below average listening comprehension skills, average oral expression skills, and a below average composite score. (Doc. 4-9, p. 41). Ms. Franklin noted that the language testing revealed errors with antonyms, adjectives, present progressive tense, and singular person pronouns. (Doc. 4-9, p. 41). Ms. Franklin reported that K.N. was "challenged by tasks that called for correcting grammatical errors, explaining idioms, and requesting information." (Doc. 4-9, p. 42).

In the areas of fluency and voice, Ms. Franklin reported that K.N. did not have abnormal disfluencies and had normal pitch, volume, and resonance. (Doc. 4-9, p. 2).

Based on her evaluation, Ms. Franklin concluded that K.N. had normal articulation skills, average expressive language skills, and below average receptive language skills. (Doc. 4-9, p. 42). Ms. Franklin opined that K.N.'s receptive language deficits "put her at risk both academically and socially" and recommended continued school enrollment, continued academic support, and monitoring for the need of additional language intervention to address the deficits. (Doc. 4-9, p. 42).

11

### *Dr. Kline's Evaluation*

On February 6, 2023, PhD/LPC Robert J. Kline evaluated K.N.'s mental status and administered the Wechster Intelligence Scale for Children.  (Doc. 4-9, pp. 43–47).[9]  Dr. Kline noted that K.N. was in the third grade, did not have a behavioral intervention plan, and did not have a history of psychiatric treatment or mental illness in her family.  (Doc. 4-9, p. 44).

When Dr. Kline asked what issues were causing K.N.'s disability, Ms. Neal reported that K.N. had difficulty reading, "g[ot] emotional sometimes," and had "some speech difficulty."   (Doc. 4-9, p. 44).  In response to further inquiry about K.N.'s "emotional problems," Ms. Neal reported that K.N. recently had become quieter and shyer after losing a grandfather and grandmother.  (Doc. 4-9, p. 44).  Dr. Kline reported that Ms. Neal did not identify "significant" emotional or behavioral problems.  (Doc. 4-9, p. 44).

Dr. Kline evaluated whether K.N. experienced symptoms of depression.  (Doc. 4-9, p. 44).  He noted that K.N. slept about eight hours each night, had a good appetite, had an estimated energy level of four out of ten, and did not show

---

[9] The Wechsler Intelligence Scale for Children "is an intelligence test that measures a child's intellectual ability and 5 cognitive domains that impact performance."  PERSON ASSESSMENTS, *Wechsler Intelligence Scale for Children Fifth Edition*, (last accessed Jan. 22, 2026) https://www.pearsonassessments.com/en-us/Store/Professional-Assessments/Cognition-%26-Neuro/Wechsler-Intelligence-Scale-for-Children-%7C-Fifth-Edition-/p/100000771?srsltid=AfmBOorJoHj0b9d8Gw7-eV-IQP7iVy4KC81AMw10nEOqzEwrGBDtDHKY&tab=overview        [https://perma.cc/3MCL-Z9EB].

"psychomotor retardation." (Doc. 4-9, p. 44). According to Dr. Kline, K.N. "enumerate[d] several pleasures in life," denied crying spells, and did not express feelings of guilt, helplessness, or hopelessness. (Doc. 4-9, p. 44).

Dr. Kline observed that K.N. was appropriately dressed, had average grooming and personal hygiene, and did not have an unusual physical appearance, mannerisms, or motor abilities. (Doc. 4-9, p. 45). Dr. Kline reported that K.N.'s mood was euthymic, that her range of affect was normal, and that she did not display signs of anxiousness. (Doc. 4-9, p. 45).

Dr. Kline reported that K.N. was adequately oriented to time, place, person, and situation for her age. (Doc. 4-9, p. 45). When asked, K.N. subtracted serial sevens from 100, determined how much she would have left if she spent $7.50 of $18,[10] and counted backwards from 20. (Doc. 4-9, p. 45). K.N. could not spell the word "world" backwards. (Doc. 4-9, p. 45).

When Dr. Kline evaluated K.N.'s memory, K.N. repeated seven digits forward and four digits in reverse. (Doc. 4-9, p. 45). She recalled three of three objects after five minutes. (Doc. 4-9, p. 45). She remembered what she had for her last meal, what she had done the day before, something she saw on her way to the appointment, her mother's birthday, the name of her first-grade teacher, and something she had done two years before. (Doc. 4-9, p. 45).

---

[10] Ms. Neal responded "$10," omitting the change. (Doc. 4-9, p. 45).

13

When Dr. Kline evaluated K.N.'s "fund of information,"  K.N. recognized the names Taylor Swift and Kim Kardashian but not Lebron James.  (Doc. 4-9, p. 45). K.N. knew that Joe Biden was the United States president but did not know that Kay Ivey was the governor of Alabama.  (Doc. 4-9, p. 45).  K.N. did not know that Montgomery was the state capital or that there were 52 weeks in the year.  (Doc. 4-9, p. 45).

When Dr. Kline assessed K.N.'s abstracting abilities, K.N. identified how two objects were alike.  (Doc. 4-9, p. 45).  She could not interpret the phrases "don't cry over spilled milk" and "strike while the iron is hot."  (Doc. 4-9, p. 45).

Dr. Kline observed that K.N. did not show loose or tangential thinking, confusion, or pressured, mumbled, or slurred speech.  (Doc. 4-9, p. 45).  Dr. Kline reported that he understood 100% of K.N.'s speech without difficulty.  (Doc. 4-9, p. 45).  Dr. Kline reported that K.N. did not demonstrate symptoms of hallucinations, delusions, ideas of reference, phobias, obsessions, compulsions, indecision, grandiosity, helplessness, hopelessness, homicidal ideation, or suicidal ideation. (Doc. 4-9, p. 45).  Dr. Kline opined that "overall, [K.N.'s] insight into [her]self and her social situation [was] good."  (Doc. 4-9, p. 45).

Dr. Kline administered the Wechster Intelligence Scale for Children in a quiet, well-lit room that was free from distractions.  (Doc. 4-9, p. 46).  Dr. Kline noted that K.N. appeared to be "putting forth a good effort" and explained that "there [was]

14

every reason to believe that the[] results [were] a true reflection of her present functioning capacity." (Doc. 4-9, p. 46). On the verbal comprehension section, K.N. scored 10 for similarities and 9 for vocabulary, yielding a VCI of 98.[11] On the fluid reasoning section, K.N. scored 9 for matrix reasoning and 7 for figure weights, yielding an FRI of 88.[12] On the processing speed section, K.N. scored 6 for coding and 8 for symbol search, yielding a PSI of 83.[13] On the visual special section, K.N. scored 12 for block design and 8 for visual puzzles, yielding a VSI of 100.[14] On the working memory section, K.N. scored 10 on digit span and 9 on picture span, yielding a WMI of 97.[15] K.N.'s overall FSIQ was 93. (Doc. 4-9, p. 46). [16]

When Dr. Kline inquired about K.N.'s daily activities, it was reported that K.N. spent most of her time at home on her cell phone or watching YouTube, that her chores included helping with housecleaning and putting her clothing away, and

---

[11] VCI stands for "Verbal Comprehension Index." PEARSON ASSESSMENTS, WISC-V INTERPRETIVE REPORT 2 (Oct. 20, 2020) https://www.pearsonassessments.com/content/dam/school/global/clinical/us/assets/wisc-v/wisc-v-interpretive-report.pdf?srsltid=AfmBOoqOfAEV4AB6KvkUDWuosiIZfERpH2FmwxTkl-a1q2agh9CRuNou [https://perma.cc/T7UG-N8BQ].

[12] FRI stands for "Fluid Reasoning Index." WISC-V INTERPRETIVE REPORT at 2.

[13] PSI stands for "Processing Speed Index." WISC-V INTERPRETIVE REPORT at 2.

[14] VSI stands for "Visual Spatial Index." WISC-V INTERPRETIVE REPORT at 2.

[15] WMI stands for "Working Memory Index." WISC-V INTERPRETIVE REPORT at 2.

[16] FSIQ stands for "Full Scale IQ." FSIQ scores ranging from 90 to 109 are considered average. WISC-V INTERPRETIVE REPORT at 2.

that she had not been sent to the principal's office for trouble that school year. (Doc. 4-9, p. 47). It was reported that K.N. got along "fairly well" with her teachers, classmates, and others her age and would receive a B grade for her overall behavior and cooperation at home. (Doc. 4-9, p. 47).

Based on K.N.'s mental status examination and WISC results, Dr. Kline concluded that K.N. had no restrictions of activities, constriction of interests, or restriction in her ability to relate with others. (Doc. 4-9, p. 47). Dr. Kline noted that K.N. did not have a history of "mental slowness" and that her presentation was "relatively normal." (Doc. 4-9, p. 47). Dr. Kline opined that, compared to other children of her age, K.N. had adequate ability to function independently for her age and did not have impairments in the domains of acquiring and using information, attending to and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for one's self, or health and physical wellbeing. (Doc. 4-9, p. 47). Dr. Kline reported that K.N.'s abilities to concentrate and persist during the exam, relate to others, interact and communicate with family and community members, understand, remember, and carry out simple one or two-step job instructions, maintain concentration and attention, and tolerate work stress appeared to be adequate. (Doc. 4-9, p. 47).

### *Educational Records*

On January 13, 2017, Ms. Neal attended a meeting to plan for K.N.'s transition from early intervention to preschool. (Doc. 4-7, pp. 38–42). The transition planning team indicated that K.N. was receiving early intervention speech therapy at home and at daycare and was prescribed albuterol for asthma. (Doc. 4-7, p. 38). The team reported that K.N. played well and had good social, cognitive, and motor skills. (Doc. 4-7, p. 38). The team reported that K.N.'s speech was difficult to understand. (Doc. 4-7, p. 38). Ms. Neal permitted the team to refer K.N. to the Local Education Agency for evaluation. (Doc. 4-7, p. 38).[17]

The team referred K.N. for an IEP evaluation based on her "poor progress in acquiring communication skills" and "easy frustration." (Doc. 4-7, p. 39).[18] The referral listed the following signs of "health, orthopedic, and medical problems": asthma, sickle cell trait, and tubes in her ears. (Doc. 4-7, p. 39). Additionally, the referral identified "hearing problems" and "limited talking" as classroom behaviors that might indicate vision or hearing problems. (Doc. 4-7, p. 39).

---

[17] A Local Educational Agency, or LEA, is "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State." 34 C.F.R. § 303.23(a).

[18] An IEP, or Individual Education Plan, provides special education services for eligible children with disabilities. ALABAMA DISABILITIES ADVOCACY PROGRAM, A RIGHT NOT TO FAVOR (2014) at 5, accessible at https://bpb-us-e2.wpmucdn.com/sites.ua.edu/dist/a/74/files/2025/02/Special-Education-ARightNotAFavorFinal.pdf [https://perma.cc/RKS3-RUWV].

On March 13, 2017, the Local Education Agency evaluated K.N.'s eligibility for special education services.  (Doc. 4-7, pp. 43–46).  K.N. passed functional hearing and vision screenings.  (Doc. 4-7, p. 43).  An examination of K.N.'s oral structure and functioning revealed that K.N. had adequate structures for speech production.  (Doc. 4-7, p. 43).  K.N. received a standard score of 98 on the fifth edition Preschool Language Scales.  (Doc. 4-7, p. 43).[19]  She scored 115 in auditory comprehension and 82 in expressive communication.  (Doc. 4-7, p. 43).  Based on these results, the examiner concluded that K.N. did not have a speech delay that adversely affected her communication.  (Doc. 4-7, pp. 43–44).

On April 11, 2017, Ms. Neal attended an IEP eligibility determination meeting.  (Doc. 4-7, p. 46).  The IEP team determined that K.N. did not meet the criteria for the suspected area of disability, have a disability that adversely affected educational performance, or need specially designed instruction to access and participate in the general education curriculum.  (Doc. 4-7, p. 46).  Accordingly, the IEP team determined that K.N. was not eligible for special education services.  (Doc. 4-7, p. 46).

---

[19] The 5th edition Preschool Language Scales, or PLS-5, "offer[] a comprehensive developmental language assessment."  PEARSON ASSESSMENTS, *Preschool Language Scales Fifth Edition* https://www.pearsonassessments.com/en-us/Store/Professional-Assessments/Speech-%26-Language/Preschool-Language-Scales-%7C-Fifth-Edition/p/100000233?srsltid=AfmBOooGeTiI2JeVubpUrl9WqfENT8Hz1vYV6ocWkQruc-Fo9xTOSW3Z [https://perma.cc/AE8H-QBFY] (last accessed Jan. 21, 2026).  Results in the range of 85-115 are average on the PLS-5.  (Doc. 4-7, p. 43).

The administrative record does not include educational records from between April 2017 and January 2022. During the 2017–18 and 2018–19 school years, K.N. attended preschool and received services through HeadStart. (Doc. 4-9, pp. 6, 15). During the 2019–20 school year, K.N. attended kindergarten at Reform Elementary School and received special education services. (Doc. 4-9, p. 22). The record does not identify where K.N. began first grade in Fall 2020, but K.N. began attending Faucett Vestavia Elementary School in Spring 2021. (*See* Doc. 4-7, p. 34). That year, K.N. received a grade of "proficient" or "outstanding" in every subject on her third- and fourth-quarter report cards. (*See* Doc. 4-7, p. 99).

The next fall, K.N. received a grade of "proficient" on most subjects; "emerging" in completing classroom assignments, language, and reading informational texts; and "needs improvement" in operations and algebraic thinking in the first quarter. (Doc. 4-7, p. 100). In the second quarter, K.N. received a grade of "proficient" on most subjects; "emerging" in language and in number and operations; and "needs improvement" in language, operations and algebraic thinking, and reading literature and informal texts. (Doc. 4-7, p. 100).

In January 2022, Faucett Vestavia implemented a Student Intervention Plan for K.N. (Doc. 4-7, pp. 150–151).[20] The intervention plan provided that K.N. would

---

[20] The fax cover page for this document indicates that it is "a copy of [K.N.]'s IEP plan." (Doc. 4-7, p. 148). The record does not include documents from an IEP referral, evaluation, or eligibility determination at Faucett Vestavia Elementary. Accordingly, it is not clear whether the intervention

solve 2-digit addition problems with 80% accuracy. (Doc. 4-7, p. 150). K.N. achieved this goal on February 4 and February 11, 2022. (Doc. 4-7, p. 150). In the third quarter of the school year, K.N. received a grade of "proficient" in most subjects and "emerging" in language and operations and algebraic thinking. (Doc. 4-7, p. 100). In the fourth quarter, K.N. received a grade of "proficient" in most subjects and "emerging" in measurements and data, operations and algebraic thinking, and foundational reading skills. (Doc. 4-7, p. 100).

That spring, K.N. scored a 502 in English language arts and a 508 in math on the Alabama Comprehensive Assessments for second grade. (Doc. 4-8, p. 14). These scores placed K.N. in the 49th percentile for language arts, the 47th percentile for math, and performance level two for both subjects. (Doc. 4-8, p. 14).[21]

In August 2022, the Tuscaloosa County School System notified Ms. Neal that K.N. was consistently showing a deficiency in reading and implemented a Student Reading Improvement Plan for the 2022–23 school year. (Doc. 4-7, p. 72). K.N.'s SRIP provided that she would "decode and encode open and closed syllables with blends and diagraphs with 80% accuracy." (Doc. 4-7, p. 72). The record does not indicate whether K.N. met this goal.

---

plan was developed under the formal process prescribed by the Individuals with Disabilities Education Act. *See generally* ALABAMA DISABILITIES ADVOCACY PROGRAM, at 4–32.

[21] A student with a performance level of two has a "partial understanding of grade-level standards and is likely to need some additional support at this level of learning." (Doc. 4-8, p. 14).

In September 2022, Faucett Vestavia updated K.N.'s Student Intervention Plan to provide that K.N. would solve three-digit addition and subtraction problems with 80% accuracy. (Doc. 4-7, p. 151). K.N. achieved 66% accuracy on December 7, 2022, and the interventionist recommended dismissal. (Doc. 4-7, p. 151).

### *Teacher Questionnaires*

K.N.'s second grade teacher, Johnna Drummond, completed a questionnaire on K.N.'s speech and language skills on May 2, 2022. (Doc. 4-7, pp. 32–34).[22] Ms. Drummond wrote: "[K.N.] is able to communicate on a normal second grade level. She has been at our school just over a year and does not receive speech services." (Doc. 4-7, p. 34). Ms. Drummond reported that K.N.'s speech or language disorder did not affect her social skills and academic development. (Doc. 4-7, p. 34).

Ms. Drummond indicated that K.N. never or rarely had difficulty saying single words, producing conversational speech that was easily understood, maintaining articulatory control as utterance length increases, and producing error sounds correctly in isolation given a model. (Doc. 4-7, p. 32). Ms. Drummond indicated that a familiar listener would understand about 97% of K.N.'s speech on a first attempt and an unfamiliar listener would understand 3% of K.N.'s speech on a first attempt. (Doc. 4-7, p. 32). Ms. Drummond reported that K.N. did not exhibit

---

[22] The questionnaire should have been completed by a speech language pathologist. (Doc. 4-7, p. 32). Because Ms. Drummond was not qualified to answer the questionnaire, her responses are not persuasive.

sound errors or phonological patterns that were not typical for her age, speak with a monotone voice, demonstrate consistently abnormal voice quality, exhibit speech fluency patterns that were not typical for age in most situations, or exhibit secondary behaviors. (Doc. 4-7, pp. 32–33).

Ms. Drummond indicated that K.N. frequently had difficulty following single-step and multi-step instructions, following classroom discussions, using complete sentences, talking about past events, producing narratives, and following verbal instructions completely without looking to see what others are doing. (Doc. 4-7, p. 33). Ms. Drummond indicated that K.N. sometimes had difficulty understanding frequently used vocabulary words, answering questions about a read-aloud story, repeating a sentence accurately, answering a question appropriately, understanding humor, and asking for repetition or clarification when she was obviously confused. (Doc. 4-7, p. 33). Ms. Drummond indicated that K.N. rarely or never had difficulty expressing wants and needs, taking turns in a conversation, and initiating and maintaining conversations with friends. (Doc. 4-7, p. 33). Ms. Drummond indicated that K.N. did not exhibit receptive or expressive vocabulary below expectations for her age, use incorrect word order, speak only in simple sentences, have difficulty understanding sarcasm or figurative language, or have difficulty interpreting body language and facial expressions. (Doc. 4-7, p. 33).

On May 13, 2022, Ms. Drummond and Millie Harrow, a school speech language pathologist, responded to a request for administrative information. They reported that K.N. recently had had a vision and hearing screening and a language evaluation. (Doc. 4-7, p. 58). When asked whether K.N. had been referred for evaluation or services, they listed K.N.'s January 2017 referral for language assessment and IEP evaluation. (*See* Doc. 4-7, p. 58). Ms. Harrow and Ms. Drummond indicated that K.N. participated in regular education and did not receive special education or therapeutic services through the school. (Doc. 4-7, p. 58).

A few days later, Ms. Harrow and Ms. Drummond completed a teacher questionnaire. (Doc. 4-7, pp. 62–69). In the acquiring and using information domain, they indicated that K.N. had no problem understanding school and content vocabulary; slight problems reading and comprehending written material, providing oral explanations and adequate descriptions, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions; obvious problems comprehending and doing math problems, understanding and participating in class discussions, and expressing ideas in written form; and a serious problem comprehending oral instructions. (Doc. 4-7, p. 63). Ms. Drummond noted that K.N. "often misses directions given in class due to not paying attention" and "often times is not focused during class, discussions, and instruction." (Doc. 4-7, p. 63). They reported that K.N. performed below grade level and saw a

23

school interventionist for 30 minutes in math and reading each day.  (Doc. 4-7, p. 63).

In the attending and completing tasks domain, Ms. Harrow and Ms. Drummond reported that K.N. had no problem sustaining attention during play/sport activities, waiting to take turns, and changing from one activity to another without being disruptive; a slight problem weekly with competing work accurately without careless mistakes; an obvious problem weekly with working with others without distracting self or others; an obvious problem daily with focusing long enough to finish an assigned activity or task, carrying out single-step instructions, and organizing her own things or school materials; an obvious problem hourly with paying attention when spoken to directly and refocusing to a task when necessary; a serious problem weekly with completing class/homework assignments; a serious problem daily with working at a reasonable pace/finishing on time; and a serious problem hourly with carrying out multi-step instructions.  (Doc. 4-7, p. 64).  They noted that K.N. "ha[d] a difficult time focusing on her work" and "struggle[d] to complete assignments[] due to being easily distracted."  (Doc. 4-7, p. 64).

Ms. Harrow and Ms. Drummond reported that K.N. had no problems in the interacting and relating with others, moving and manipulating objects, and caring for herself domains.  (Doc. 4-7, pp. 65–67).  In the health and physical wellness domain, they noted that K.N. had asthma, sickle cell trait, and tubes in her ears; that

24

K.N. did not use glasses, hearing aids, or other disability aids at school; and that they did not know whether K.N. was taking medication. (Doc. 4-7, p. 68). They checked a box indicating that K.N. frequently missed school because of illness but noted that her absences were unexcused because there was no documentation of illness. (Doc. 4-7, p. 68).

On October 21, 2022, K.N.'s third grade teacher, Maranda McMillan, completed a teacher questionnaire. (Doc. 4-7, pp. 88–96). In the domain of acquiring and using information, Ms. McMillan reported that K.N. had no problems comprehending oral instructions, understanding and participating in class discussions, providing oral explanations and adequate descriptions, expressing ideas in written form, learning new material, or recalling and applying previously learned material; slight problems in understanding school and content vocabulary, reading and comprehending written material, and applying problem-solving skills in class discussions; and an obvious problem in comprehending and doing math problems. (Doc. 4-7, p. 90). Ms. McMillan noted that K.N. saw an intervention teacher for math for 30 minutes daily. (Doc. 4-7, p. 90).

In the domain of moving about and manipulating objects, Ms. McMillan reported that K.N. had no problem moving and manipulating things, demonstrating strength, coordination, and dexterity in activities or tasks, managing the pace of physical activities or tasks, showing a sense of her body's location and movement in

space, integrating sensory input with motor output, and planning, remembering, and executing controlled motor movements. (Doc. 4-7, p. 93). Ms. McMillan indicated that K.N. had a slight problem with moving her body from one place to another and noted that K.N. "seem[ed] to drag one foot when walking." (Doc. 4-7, p. 93).

Ms. McMillan reported that K.N. had no problem in the attending and completing tasks, interacting and relating with others, caring for herself, and health and physical wellbeing domains. (Doc. 4-7, pp. 91–92, 94–95).

Ms. McMillan also completed a speech and language questionnaire. (Doc. 4-9, p. 34–36).[23] Ms. McMillan reported that K.N. frequently had difficulty saying single words clearly, producing conversational speech that is easily understood, maintaining articulatory control as utterance length increases, and producing error sounds correctly in isolation, given a model. (Doc. 4-9, p. 34). Ms. McMillan estimated that a familiar listener would understand 95% of K.N.'s speech on a first attempt and 100% of K.N.'s speech with repetition. (Doc. 4-9, p. 34). Ms. McMillan estimated that an unfamiliar listener could understand 5% of K.N.'s speech on a first attempt. Ms. McMillan reported that K.N. did not exhibit sound errors or phonological patterns not typical for her age, speak with a monotone voice, demonstrate abnormal vocal quality, exhibit speech fluency patterns that were

---

[23] The questionnaire should have been completed by a speech language pathologist. (Doc. 4-7, p. 32). Thus, Ms. McMillan was not qualified to answer the questionnaire, and her responses are not persuasive.

atypical for her age in most situations, or exhibit secondary behaviors. (Doc. 4-9, pp. 34–35). Ms. McMillan reported that K.N.'s speech was audible at conversational distances on first attempt half or more of the time. (Doc. 4-9, p. 35).

Ms. McMillan reported that K.N. never or rarely had difficulty following single and multi-step verbal instructions, understanding frequently used vocabulary words, answering questions about a read-aloud story, following a classroom discussion, repeating a sentence accurately, answering a question appropriately, understanding humor, expressing needs and wants, using complete sentences, talking about past events, describing a picture/object, producing narratives, taking turns in conversation, and initiating and maintaining conversations with friends. (Doc. 4-9, p. 35). Ms. McMillan reported that K.N. did not exhibit expressive or receptive vocabulary below expectation for age, use incorrect word order, have difficulty understanding sarcasm or figurative language, or have difficulty interpreting body language and facial expressions. (Doc. 4-9, p. 35). Ms. McMillan reported that K.N. spoke only in simple sentences. (Doc. 4-9, p. 35). Ms. McMillan noted that K.N. was not receiving services and did not have a diagnosis of speech or language impairment and indicated that K.N.'s speech and language did not adversely affect her social skills and academics. (Doc. 4-9, p. 36).

Ms. McMillan responded to a request for administrative information and completed another teacher questionnaire on March 30, 2023. (Doc. 4-7, pp. 123–

131).  Ms. McMillan reported that K.N. did not have an educational disability and participated in regular education.  (Doc. 4-7, p. 123).  In the accompanying teacher questionnaire, Ms. McMillan reported that K.N. had no problems in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for herself, and health and physical wellness.  (Doc. 4-7, pp. 124–130).

### *Parent Questionnaires*

Ms. Neal completed functional reports on January 25, 2022 and October 20, 2022.  (Doc. 4-7, pp. 4–12, 74 –84).  In January and October 2022, Ms. Neal reported that K.N. did not have problems seeing or hearing.  (Doc. 4-7, p. 4; Doc. 4-7, p. 75).

On January 25, 2022, Ms. Neal reported that K.N. was "totally unable to talk." (Doc. 4-7, p. 5).  Ms. Neal noted that K.N. had problems speaking clearly and a limited ability to communicate.  (Doc. 4-7, p. 5).  Ms. Neal reported that people who knew K.N. well and people who did not know K.N. well understood her speech "some of the time."  (Doc. 4-7, p. 5).  Ms. Neal indicated that K.N. could tell jokes or riddles accurately; explain why she did something; use sentences with "because," "what if," or "should have been;" and talk with family.  (Doc. 4-7, p. 6).  Ms. Neal indicated that K.N. did not repeat stories she had heard or talk with friends.  (Doc. 4-7, p. 6).

On October 22, 2025, Ms. Neal reported that K.N. was not "totally unable to talk." (Doc. 4-7, p. 76). Ms. Neal indicated that K.N. had problems talking clearly and a limited ability to communicate. (Doc. 4-7, pp. 76–77). Ms. Neal indicated that people who knew K.N. well understood her speech "some of the time" or "hardly ever" and that people who did not know K.N. well understood her speech "most of the time." (Doc. 4-7, p. 76).[24] Ms. Neal reported that K.N. could repeat stories she had heard and talk with family and friends but could not deliver telephone messages, tell jokes or riddles accurately, explain why she did something, or use sentences with "because," "what if," or "should have been." (Doc. 4-7, p. 77).

In January and October 2022, Ms. Neal indicated that K.N. had a limited ability to progress in learning. (Doc. 4-7, p. 7; Doc. 4-7, p. 78). In January, she reported that K.N. could read upper-case and lower-case letters, print some letters, and print her name. (Doc. 4-7, p. 7). Ms. Neal reported that K.N. knew the days of the week and months of the year. (Doc. 4-7, p. 7). Ms. Neal reported that K.N. could not read simple words, read and understand simple sentences, read or understand stories in books or magazines, write in longhand, spell most 3-4 letter words, write a simple story with 6-7 sentences, add and subtract numbers over time, understand money and make correct change, or tell time. (Doc. 4-7, p. 7). In

---

[24] Ms. Neal likely intended to indicate that people who did not know K.N. well understood her speech some of the time or hardly ever and that people who knew K.N. well understood her speech most of the time.

October, Ms. Neal reported that K.N. could read upper-case and lower-case letters, sometimes read simple words, read and understand stories in books or magazines, print some letters, print her name, and spell most 3-4 letter words. (Doc. 4-7, p. 78). Ms. Neal reported that K.N. knew the days of the week and months of the year. (Doc. 4-7, p. 78). Ms. Neal reported that K.N. could not read and understand simple sentences, write in longhand, write a simple story with 6-7 sentences, add and subtract numbers over 10, understand money and make correct change, or tell time. (Doc. 4-7, p. 78).

In January and October 2022, Ms. Neal indicated that K.N.'s physical abilities were limited. (Doc. 4-7, p. 8; Doc. 4-7, p. 79). In January, Ms. Neal reported that K.N. could walk, run, throw a ball, use scissors, work video game controls, and dress/undress dolls or action figures but could not ride a bike, jump rope, use roller skates or blades, or swim. (Doc. 4-7, p. 8). In October, Ms. Neal reported that K.N. could walk, run, throw a ball, ride a bike with training wheels, jump rope, use scissors, and dress/undress dolls or action figures but could not ride a bike without training wheels, use roller skates or blades, or swim. (Doc. 4-7, p. 79).

Ms. Neal indicated that K.N.'s impairments affected her behavior with other people. (Doc. 4-7, p. 9; Doc. 4-7, p. 80). In January, Ms. Neal reported that K.N. had friends her own age, generally got along with adults, and generally got along with school teachers. (Doc. 4-7, p. 9). She reported that K.N. could not make new

friends and did not play team sports.  (Doc. 4-7, p. 9).  In October, Ms. Neal reported the same except that K.N. could make new friends.  (Doc. 4-7, p. 80).

Ms. Neal reported that K.N.'s impairments affected her ability to help herself and cooperate with others in taking care of personal needs. (Doc. 4-7, p. 10, 81).  In January, Ms. Neal reported that K.N. could use zippers, brush teeth, eat using utensils, pick up and put away toys, hang up clothes, do what she was told most of the time, and get to school on time.  (Doc. 4-7, p. 10).  She reported that K.N. could not button clothes, tie shoelaces, take a bath or shower without help, comb or brush her hair, wash her hair by herself, choose her clothes, help around the house, obey safety rules, or accept criticism or correction.  (Doc. 4-7, p. 10).  In October, Ms. Neal reported the same, except that K.N. could obey safety rules.  (Doc. 4-7, p. 81).

Ms. Neal indicated that K.N.'s ability to pay attention and stick with a task was limited.  (Doc. 4-7, pp. 11, 81).  In January, Ms. Neal reported that K.N. could keep busy on her own and complete chores most of the time but could not finish things she started, work on arts and crafts projects, or complete homework.  (Doc. 4-7, p. 11).  In October, Ms. Neal reported the same, except that K.N. could complete homework.  (Doc. 4-7, p. 81).

In January, Ms. Neal indicated that K.N. had "some sleep apnea."  (Doc. 4-7, p. 12).  Ms. Neal did not indicate whether K.N. still had sleep apnea in October 2022.

31

Ms. Neal requested a continuation of K.N.'s benefits in March 2022 based on K.N.'s emotional and learning problems. (Doc. 4-4, p. 13; Doc. 4-7, pp. 13–21). Ms. Neal reported that K.N. had completed first grade, was in a special education program, and received accommodations at school. (Doc. 4-7, pp. 14–15).[25] Ms. Neal indicated that K.N. received daily reading tutoring. (Doc. 4-7, p. 15). Ms. Neal reported that K.N. had been tested by a public/community health department, developmental evaluation center, mental health/intellectual disability, speech and hearing center, and the Women, Infants, and Children Program. (Doc. 4-7, p. 16). Ms. Neal did not identify the agencies that performed the evaluations. (Doc. 4-7, p. 16). Ms. Neal reported that K.N. did not receive special therapy, exercises, or other services for her impairments. (Doc. 4-7, p. 17). Ms. Neal indicated that K.N. received vocational rehabilitation services at Faucett Vestavia. (Doc. 4-7, p. 18). Ms. Neal identified K.N.'s grandmother, Wanda Gary, as an individual who could give information about the child. (Doc. 4-7, p. 20).

On March 30, 2022, Ms. Neal participated in a continuing disability interview. (Doc. 4-7, pp. 22–27). Ms. Neal did not identify physical or mental conditions that limited K.N.'s ability to do the same things as other children of the same age. (Doc. 4-7, p. 23). Ms. Neal indicated that K.N. received evaluation or treatment at Pickens

---

[25] K.N.'s school records contradict Ms. Neal's representations that K.N. was in a special education program and received accommodations at school. (*See* Doc. 4-7, p. 58). K.N. received services from an interventionist for 30 minutes in math and reading each day. (Doc. 4-7, p. 63).

County Medical Center. (Doc. 4-7, p. 23). She did not explain what conditions were treated or evaluated. (Doc. 4-7, p. 24).

Ms. Neal reported that K.N. experienced new physical or mental conditions beginning in 2020. (Doc. 4-7, p. 106). Ms. Neal explained that K.N. would "stare into space" and "c[ould not] comprehend at times." (Doc. 4-7, p. 106). Ms. Neal did not identify medical treatment or medication K.N. had received. (Doc. 4-7, pp. 106, 107). Ms. Neal reported that K.N. had experienced a change in her daily activities because of physical or mental conditions and stated that K.N. "still need[ed] reading, math and etc." and "[didn't] like being around others." (Doc. 4-7, p. 107). Ms. Neal indicated that K.N. continued to receive vocational rehabilitation services at Faucett Vestavia. (Doc. 4-7, p. 108). Ms. Neal made an identical report on November 1, 2023. (Doc. 4-7, pp. 142–147).

### *Medical Records*

Ms. Neal submitted records from primary care visits documenting K.N.'s history of asthma.

K.N. visited University Medical Center on January 30, 2018. (Doc. 4-9, pp. 15–19). Jaquelynn Luker, M.D., noted that K.N. had sleep apnea and a history of prematurity but had been "developing well." (Doc. 4-9, p. 15). Dr. Luker diagnosed K.N. with moderate, persistent asthma. (Doc. 4-9, p. 15). K.N. met the developmental milestones of using 3–5-word sentences, asking why/what, balancing

on one foot, building a ten-block tower, copying a circle and X, counting to three, dressing herself, knowing her name/age/gender, playing with other kids, recognizing three colors, and walking upstairs with alternating feet. (Doc. 4-9, pp. 16–17). K.N. did not meet the developmental milestones of pedaling a tricycle and being toilet trained. (Doc. 4-9, p. 17). Dr. Luker recorded normal findings from K.N.'s physical exam. (Doc. 4-9, p. 17).

K.N. visited University Medical Center on February 13, 2019. (Doc. 4-9, pp. 6–10). Charles Geno, M.D., noted that K.N. had asthma and used a nebulizer approximately three times per week. (Doc. 4-9, p. 6). Dr. Geno performed a physical exam and reported normal findings. (Doc. 4-9, p. 8).

K.N. visited University Medical Center for a rash on May 5, 2022. (Doc. 4-9, pp. 25–30). Dr. Luker performed a physical exam and reported normal findings for all categories but K.N.'s skin. (Doc. 4-9, p. 8). Dr. Luker noted that K.N. had "mild persistent asthma without complication" that was "controlled." (Doc. 4-9, p. 29).

### *ALJ Hearing*

On April 29, 2024, the ALJ held a hearing. (Doc. 4-3, pp. 51–61). Ms. Neal attended the hearing without K.N. (Doc. 4-3, p. 53). The ALJ asked Ms. Neal whether she would like to waive her right to representation and proceed with the hearing or postpone the hearing to obtain representation. (Doc. 4-3, pp. 53–54). Ms.

Neal responded that she wanted to proceed and waived her right to representation. (Doc. 4-3, p. 54).

The ALJ discussed the evidence in K.N.'s file and explained the standards that govern a child's cessation of benefits case before questioning Ms. Neal. (Doc. 4-3, pp. 54–56).

Ms. Neal testified that K.N. was in fourth grade, received speech services through school, and was seeing a therapist for non-educational purposes. (Doc. 4-3, p. 56). Ms. Neal indicated that she did not know whether the ALJ had information about K.N.'s therapy. (Doc. 4-3, p. 56).

The ALJ told Ms. Neal that he had records from Vestavia Elementary, a consultative psychological report, a consultative speech and language report, and medical records from Dickens County Medical Center. (Doc. 4-3, pp. 56–57). The ALJ explained that K.N.'s continuing disability review indicated that K.N. did not have limitations in the six functional domains. (Doc. 4-3, pp. 57–58). Ms. Neal asked if the ALJ had records from Jenkins and Richardson Associates and explained that K.N. began seeing a therapist at Jenkins and Richardson Associates in January of 2024. (Doc. 4-3, p. 59). Ms. Neal testified that she had faxed the records. (Doc. 4-3, p. 59). The ALJ responded that the Social Security Commission did not receive evidence dated after July 2023. (Doc. 4-3, p. 59).

Ms. Neal disputed the ALJ's statement and testified that she had confirmation of faxing the records in December 2024. (Doc. 4-3, p. 60). The ALJ responded that he did not "have it in the file" and that he could not rely on verbal statements. (Doc. 4-3, p. 60). The ALJ repeated that the most recent evidence in K.N.'s file was from 2023 and that no evidence had been received in 2024. (Doc. 4-3, p. 60). The ALJ asked whether Ms. Neal had anything else she wanted to present. (Doc. 4-3, p. 60). Ms. Neal responded that she did not, and the ALJ concluded the hearing. (Doc. 4-3, pp. 60–61).

## THE ALJ'S DECISION

The ALJ found that the CPD, i.e. the most recent favorable medical decision finding that K.N. was disabled, is the determination dated November 24, 2020. (Doc. 4-3, p. 34). The ALJ found that, at the time of the CPD, K.N. had a medically determinable speech and language impairment that functionally equaled the listings. (Doc. 4-3, p. 34). The ALJ found that medical improvement occurred as of February 14, 2023. (Doc. 4-3, pp. 34–35). The ALJ found that K.N. was a school-aged child as of February 14, 2023. (Doc. 4-3, p. 35).

The ALJ concluded that K.N.'s speech language impairment had not functionally equaled the listings since February 14, 2023. (Doc. 4-3, pp. 35–40). The ALJ found that K.N.'s speech language impairment caused less than marked limitations in the domains of acquiring and using information and health and

physical well-being.  (Doc. 4-3, pp. 36, 39–40).  The ALJ found that K.N.'s speech language impairment caused no limitation in the domains of attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for herself.  (Doc. 4-3, pp. 36–39).

The ALJ determined that K.N. had a severe impairment of low average intellectual functioning.  (Doc. 4-3, pp. 40–41).  The ALJ determined that K.N. had the non-severe impairments of below average speech language skills and mild persistent asthma.  (Doc. 4-3, p. 40).  The ALJ found that, as of February 14, 2023, K.N. had not had an impairment or combination of impairments that functionally equaled the listings.  (Doc. 4-3, pp. 41–45).  The ALJ found that K.N. had less than marked limitations in the domains of acquiring and using information and health and physical well-being, and K.N. had no limitation in the domains of attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for herself.  (Doc. 4-3, pp. 43–45).

Based on a review of the evidence, the ALJ concluded that K.N.'s disability ended as of February 14, 2023 and that K.N. had not become disabled again.  (Doc. 4-3, p. 45).

## THE APPEALS COUNCIL'S DECISION

Ms. Neal asked the Commissioner to reconsider the ALJ's decision. (Doc. 4-3, pp. 23–26). Ms. Neal indicated that she was appealing the issue of overpayment because "all funds that were given accommodated [K.N.]." (Doc. 4-3, pp. 23, 25).

To support her appeal, Ms. Neal submitted a letter from Dr. Luker dated September 5, 2024 in which Dr. Luker explained that he had referred K.N. to Children's of Alabama Nephrology, and K.N. was being evaluated for pediatric hypertension, (Doc. 4-3, p. 17); a fax from Dr. Luker dated August 30, 2024, stating that K.N. was being seen for health issues at Children's of Alabama, with the words "prematurity/kidney" written below, (Doc. 4-3, p. 18); and a referral communication form reflecting that K.N. was referred to nephrology at Children's Hospital on August 29, 2024, (Doc. 4-3, p. 19–20). The Appeals Counsel denied Ms. Neal's request for review. (Doc. 4-3, pp. 10–13).

## EVIDENCE NOT IN THE ADMINISTRATIVE RECORD

In October 2025 and March 2026, Ms. Neal filed medical records demonstrating K.N.'s history of high blood pressure. (Docs. 9, 10).[26]

According to those records, on July 10, 2024, K.N. visited University Medical Center for a well-child examination. (Doc. 9, p. 14). Dr. Luker noted that K.N.

---

[26] Ms. Neal submitted the records after the Commissioner filed an initial brief in this matter, (Doc. 6). Therefore, the Commissioner's initial brief does not address this evidence. On March 26, 2026, the Commissioner responded to the evidence Ms. Neal filed in March 2026. (Doc. 11).

reported no new concerns or concerns with home and environmental safety. (Doc. 9, p. 14). K.N. was not using her Flovent inhaler for asthma but was using albuterol at school as needed. (Doc. 9, p. 14). K.N. was meeting "all behavioral and developmental milestones." (Doc. 9, p. 14). K.N.'s grandmother reported that K.N. stayed awake "later than she should" but otherwise reported no concerns with K.N.'s sleep. (Doc. 9, p. 14). K.N. had adequate nutrition, no concerns with voiding or stooling, and did not have a fever, infection, weight loss, fatigue, chest pain, or shortness of breath. (Doc. 9, p. 14).[27] Dr. Luker indicated that K.N. had boils, chronic asthma, and a history of prematurity. (Doc. 9, p. 14). Dr. Luker's physical exam yielded normal results. (Doc. 9, pp. 16–17). Dr. Luker determined that K.N. had elevated blood pressure, ordered labs, and recommended that K.N.'s caregivers start keeping a log of K.N.'s blood pressure twice per day. (Doc. 9, p. 18). Dr. Luker opined that K.N. was "overall" a "healthy 10-year-old girl." (Doc. 9, p. 18).

On December 23, 2024, K.N. visited University Medical Center to follow up on her blood pressure issues. (Doc. 9, p. 9). Paul Lavender Jr., M.D., noted that K.N. had a history of high blood pressure readings at the clinic, was not on medication, did not present complaints, and had "lots of stress at home." (Doc. 9, p.

---

[27] Dr. Luker abbreviates "shortness of breath" as "SOB." *See* MEDLINE PLUS, *Understanding Medical Words: A Tutorial – Appendix B: Some Common Abbreviations,* NATIONAL LIBRARY OF MEDICINE (last updated March 6, 2020) https://medlineplus.gov/appendixb.html [https://perma.cc/RK7V-FC54].

9).  Dr. Lavender indicated that K.N. had boils, chronic asthma, and a history of prematurity.  (Doc. 9, p. 9).  Dr. Lavender performed a physical exam that yielded normal results.  (Doc. 9, p. 11).  Dr. Lavender determined that K.N. had slightly elevated blood pressure on the first reading and normal blood pressure on a repeat reading.  (Doc. 9, p. 12).  Dr. Lavender recommended that K.N.'s caregivers continue to check her blood pressure at home and follow up with her primary care provider in 3 to 4 months.  (Doc. 9, p. 12).

Ms. Neal obtained a "good faith estimate" from Children's of Alabama dated April 22, 2025 that explained how much an anticipated nephrology visit for K.N. would cost.  (Doc. 9, pp. 1–2).  The estimate listed K.N.'s diagnosis as high blood pressure.  (Doc. 9, p. 2).  K.N. visited Children's of Alabama's nephrology clinic on June 11, 2025.  (Doc. 9, pp. 3, 5).  Kyle Deville, M.D. ordered labs for "elevated BP without diagnosis of hypertension."  (Doc. 9, pp. 3, 5).  Dr. Deville indicated that the clinic would call K.N.'s caregivers with results from a home blood pressure monitor and follow up based on those results.  (Doc. 9, p. 5).  The lab and blood pressure monitor results are not in the record.

On February 2, 2026, K.N. visited University Medical Center for a well-child examination.  (Doc. 10, p. 3).  Dr. Luker noted that K.N. presented with pediatric hypertension and was "rarely" using an inhaler for asthma.  (Doc. 10, p. 3).  K.N. was "perform[ing] above grade level" and "earning all A's in school."  (Doc. 10, p.

4).  K.N. reported that she slept through the night, but did not sleep a minimum of 8.5 hours nightly.  (Doc. 10, p. 4).  K.N. failed a vision screening and had elevated blood pressure.  (Doc 10, pp. 6, 8).  Dr. Luker's physical exam yielded otherwise normal results.  (Doc. 10, pp. 6–7).  To address K.N.'s high blood pressure, Dr. Luker ordered labs and prescribed K.N. 12.5 mg of HCTZ daily.  (Doc. 10, p. 8).[28] Dr. Luker recommended that K.N. visit an optometrist to address her visual deficits. (Doc. 10, p. 8).  Dr. Luker opined that K.N. was "doing well and meeting all of her developmental milestones."  (Doc. 10, p. 8).  In a letter dated February 18, 2026, Dr. Luker wrote that he was treating K.N. for "medical conditions involving her vision and blood pressure" and indicated that K.N. required "breaks to use the restroom as needed" because of medication side effects.  (Doc. 10, p. 1).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510–11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

---

[28] HCTZ, or Hydroochlorothiazide, is a "thiazide diuretic," i.e. a "water pill."  MAYO CLINIC, *Hydrochlorothiazide* (last updated Feb. 1, 2026) https://www.mayoclinic.org/drugs-supplements/hydrochlorothiazide-oral-route/description/drg-20071841 [perma cc].  HCTZ is used to treat high blood pressure and fluid retention.  *Id.*

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If the ALJ's factual findings are supported by substantial evidence, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards.  If the district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

**DISCUSSION**

Ms. Neal argues that the Secretary erred by failing to consider new medical evidence.  (Doc. 1, p. 5).  Construing Ms. Neal's complaint liberally, the Court identifies three issues Ms. Neal raises.  The Court must determine whether the Appeals Council erred by denying review of Ms. Neal's claim based on evidence submitted after the ALJ's decision; whether this Court should remand Ms. Neal's case for reconsideration based on new, material evidence; and whether the ALJ erred by failing to obtain and review the therapist records Ms. Neal referenced during the ALJ hearing.[29]

The Appeals Council did not err by declining to review the ALJ's decision based on the evidence Ms. Neal submitted after the ALJ rendered his decision.

> With a few exceptions, the claimant is allowed to present new evidence at each stage of this administrative process. *See* 20 C.F.R. § 404.900(b). The Appeals Council must consider new, material, and chronologically relevant evidence and must review the case if "the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." [20 C.F.R.] § 404.970(b).

*Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007). "[W]hen a claimant properly presents new evidence to the Appeals Council, a reviewing Court must consider whether that new evidence renders the denial of

---

[29] The Commissioner argues that the ALJ's decision is supported by substantial evidence.  (Doc. 6).  The Commissioner has addressed the new medical evidence Ms. Neal submitted to this Court in March 2026, (*see* Doc. 11), but the Commissioner has not addressed the therapist records Ms. Neal discussed during the administrative hearing.  (*See* Docs. 6, 11).

benefits erroneous." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007).

As discussed above, Ms. Neal submitted new medical records to the Appeals Council which indicate that K.N. was being evaluated and/or treated for kidney disease. (Doc. 4-3, pp. 17–20). These records do not suggest that K.N.'s kidney issues, alone or in combination with K.N.'s other impairments, caused K.N. marked or severe impairments in any of the six functional domains. Therefore, the evidence does not render the ALJ's findings or conclusions contrary to the weight of the evidence in the record, and the Appeals Counsel did not err by failing to review the case and consider the new evidence.

Likewise, the new medical records Ms. Neal submitted to this Court do not require this Court to remand Ms. Neal's case for reconsideration. Pursuant to sentence six of 42 U.S.C. § 405(g), a district Court must remand a benefits application to the Commissioner for further development of the record if the claimant demonstrates "that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Evidence is material if it is "relevant and probative so that there is a reasonable possibility that it would change the administrative result." *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986). Like the records submitted to the Appeals Council, the records submitted to this Court do

not suggest that K.N. has an impairment or combination of impairments that cause marked or severe impairment in any of the six functional domains. *Ingram*, 496 F.3d at 1261. Thus, the evidence is not material and does not provide grounds for a sentence six remand.

Turning to the third question, the ALJ erred when he failed to obtain and review the therapy records Ms. Neal identified during the hearing.

A social security claimant "bears the burden of proving that [she] is disabled" and "is responsible for producing evidence to support her claim." *Larry v. Comm'r of Soc. Sec.*, 506 Fed. Appx. 967, 968–69 (11th Cir. 2013) (citing *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003)). Yet, "[b]ecause a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record." *Larry*, 506 Fed. Appx. at 968–69 (quoting *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir. 1981)). Developing the record "is an onerous task, as the ALJ must 'scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'" *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015) (quoting *Cowart*, 662 F.2d at 735). When a claimant proceeds *pro se*, the ALJ's duty to develop the record is heightened. *Wisner v. Astrue*, 496 F. Supp. 2d 1299, 1302 (N.D. Ala. 2007) (citing *Cowart*, 662 F.2d 731, 735 (11th Cir. 1981)); *see Santos v. Soc. Sec. Admin., Comm'r*, 731 Fed. Appx. 848, 854 (11th Cir. 2018) ("This duty is greater for an unrepresented claimant[.]") (citing *Graham v.*

45

*Apfel*, 129 F.3d 1420, 1422–23 (11th Cir. 1997); *Hudson v. Heckler*, 755 F.2d 781, 784–85 (11th Cir. 1985)).

"In determining whether a claimant is disabled, the ALJ must consider the evidence as a whole." *Henry*, 802 F.3d at 1267 (citing *Spencer v. Heckler*, 765 F.2d 1090, 1093 (11th Cir. 1985) (per curiam)). Accordingly, "remand for further factual development of the record before the ALJ is appropriate where 'the record reveals evidentiary gaps which result in unfairness or clear prejudice.'" *Henry*, 802 F.3d at 126 (quoting *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995) (per curiam)).

Here, the ALJ did not fulfill his duty to develop a full and fair record. As discussed, Ms. Neal stated that K.N. saw a therapist before the ALJ hearing and that she faxed therapy records to the Administration. (Doc. 4-3, p. 59). The ALJ stated that he did not have those records, and there is no indication that the ALJ allowed Ms. Neal to submit the records or that he otherwise attempted to obtain those records. In light of Ms. Neal's *pro se* status and comments about missing records during the hearing, the ALJ's duty to "scrupulously and conscientiously probe into . . . all relevant facts" required him to provide Ms. Neal an opportunity to submit the records or to otherwise make reasonable attempts independently to obtain and review the records before he decided Ms. Neal's claim. *Henry*, 802 F.3d at 1267.

Because the record before this Court does not include the therapy records identified during the ALJ hearing, this Court "ha[s] no way of knowing" whether the

46

records would support Ms. Neal's allegations of K.N.'s functional deficits. *Brown*, 44 F.3d at 931, 936.[30] "In the absence of proof to the contrary, however, we must assume that [the records] [would] lend credence to her allegations." *Brown*, 44 F.3d 931, 936. Ms. Neal would be "undoubtedly prejudiced" by a "lack of medical . . . documentation supporting [her] allegations of disability." *Brown*, 44 F.3d at 935–36. Accordingly, the Court finds that the ALJ failed to develop the record, and Ms. Neal was prejudiced as a result.

## CONCLUSION

"The ALJ did not satisfy his duty to develop a full and fair record [citation omitted] and correlatively, did not consider the evidence as a whole." *Henry*, 802 F.3d at 1270. The ALJ's failure to determine whether the therapy records identified by Ms. Neal contained evidence of K.N.'s functional deficits resulted in an unfair and prejudicial judgment regarding the child's disability status. *See Henry*, 802 F.3d at 1270 (citing *Brown*, 44 F.3d at 935–36). Accordingly, pursuant to sentence four of 42 U.S.C. § 405(g), the Court will reverse the Commissioner's decision and remand this matter for determination of whether the therapy records from Jenkins

---

[30] Likewise, the Court is unable to determine whether the therapy records are "chronologically relevant" because although the records post-date the cessation of disability determination, the Court cannot ascertain whether they contain medical opinions that "relate back to" the date of that decision. *See Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1322 (11th Cir. 2015).

and Richardson Associates contain information that would affect the ALJ's findings and conclusions.

**DONE** and **ORDERED** this March 27, 2026.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE